The LTV CORPORATION and CKH Corporation, Plaintiffs,

v.

GRUMMAN CORPORATION, et al., Defendants.

No. CV 81 3322.

United States District Court, E. D. New York.

Oct. 16, 1981.

Davis, Polk & Wardwell, New York City, for plaintiffs.

Cahill, Gordon & Reindel, and Whitman & Ransom, New York City, for defendants.

*Memorandum of Decision and Order*
MISHLER, District Judge.

Plaintiffs seek a preliminary injunction enjoining defendants from purchasing any

common stock or convertible securities of the Grumman Corporation ("Grumman") based on claims of violations of Sections 13(d), 13(e), 14(d) and 14(e) of the Securities Exchange Act of 1934 ("the 1934 Act"), 15 U.S.C. §§ 78m(d), (e) and 78n(d), (e) and the regulations promulgated thereunder by the Securities and Exchange Commission ("S.E. C.").

*The Complaint*

CKH Corporation, an indirect wholly-owned subsidiary of The LTV Corporation ("LTV"), brings this action as the tender offeror of shares of Grumman stock in accordance with a Schedule 14D–1 statement filed with the S.E.C. on September 24, 1981.[1] John C. Bierwirth is Chairman of the Board of Directors of Grumman, Robert O. Freese is a Senior Vice President and a Director of Grumman, and Carl A. Paladino is a Senior Vice President of Grumman Aerospace Corporation (a wholly-owned subsidiary of Grumman). Bierwirth, Freese and Paladino constitute all of the trustees of the Grumman Corporation Pension Plan ("the Pension Plan"). Robert W. Bradshaw is Secretary of Grumman; Howard J. Dunn is a Vice President of Grumman Aerospace Corporation; and John O'Brien is an Executive Vice President of Grumman Aerospace.

Bradshaw, Dunn and O'Brien are trustees of the Grumman Employee Investment Plan ("the Investment Plan"). The other individual defendants are directors of Grumman.

■ The complaint alleges a scheme and conspiracy by defendants to frustrate LTV's efforts to acquire more than 50% of the Grumman stock. By (1) purchasing large blocks of stock (more than 1,000,000 shares on October 12, 1981, including 400,-000 shares in a single transaction), (2) announcing that neither Grumman nor the Pension Plan, nor the Investment Plan would tender their shares to LTV, and (3) stating that they controlled sufficient shares of stock to block LTV's proposed takeover, Grumman and the Pension Plan put their conspiracy into operation. In Count I, plaintiffs claim that the massive buying program constituted a tender offer subjecting defendants to the filing requirements and the purchasing limitations imposed under Sections 14(d) and 14(e) of the 1934 Act.[2] In Count II, plaintiffs allege a violation of Section 13(e)(1) of the 1934 Act[3] in that neither Grumman nor the Pension Plan filed the statement required under Rule 13e–1. In Count III plaintiffs

---

**1.** On October 14, 1981, the court granted Grumman's application enjoining LTV from purchasing Grumman shares. See memorandum of decision *Grumman Corporation v. The LTV Corporation, et al.,* 527 F.Supp. 86 (E.D.N.Y. 1981).

**2.** Section 14(d)(1) recites, in pertinent part:

It shall be unlawful for any person directly or indirectly, ... to make a tender offer for, or a request or invitation for tenders of, any class of equity security ... if, after consummation thereof, such person would, directly or indirectly, be the beneficial owner of more than 5 per centum of such class, unless at the time copies of the offer or request or invitation are first published or sent or given to security holders such person has filed with the Commission a statement containing such of the information specified in section 78m(d) of this title [section 13d], and such additional information as the Commission may by rules and regulations prescribe as necessary or appropriate in the public interest ....

Rule 14d–6, 17 C.F.R. § 240.14d–6 outlines the necessary information required in an Offer to Purchase.

Section 14(e) makes it "unlawful for any person to make any untrue statement of a material fact or omit to state any material fact ... in connection with any tender offer or request or invitation for tenders ...."

**3.** Section 13(e)(1) states, in pertinent part:

It shall be unlawful for an issuer ... to purchase any equity security issued by it if such purchase is in contravention of such rules and regulations as the Commission, in the public interest or for the protection of investors, may adopt....

Rule 13e–1, 17 C.F.R. § 240.13e–1, provides, in pertinent part:

When a person other than the issuer makes a tender offer for, or request or invitation for tenders of, any class of equity securities of an issuer ... such issuer shall not thereafter, during the period of such tender offer, request or invitation continues, purchase any equity securities of which it is the issuer unless it has ... [filed a statement with the Commission as set forth in the rule.]

allege a violation of the Employee Retirement Income Security Act of 1974 ("ERISA") in that the trustees of the Pension Plan, who also act as officers and directors of Grumman, violated their fiduciary obligation to the beneficiaries of the Pension Plan in purchasing Grumman stock at an inflated market price.[4]

### Findings

The court having conducted an evidentiary hearing finds as follows:

On October 9, 1981, Grumman and the Pension Plan were granted an exemption from Rule 10b–6 (Prohibition Against Trading by Persons Interested in a Distribution) which thereby permitted Grumman and the Pension Plan to purchase both Grumman common stock and Grumman securities convertible into common stock.

On October 12, 1981, prior to the opening of trading in Grumman stock on the New York Stock Exchange, the trustees of the Pension Plan issued a release announcing that the Pension Plan was authorized to purchase about 1,275,000 shares and may increase its investment in Grumman stock and that the information concerning its program was being mailed to Grumman shareholders that day. That same day (Columbus Day), a Rule 13e–1 Transaction Statement was mailed to all shareholders. S.E.C. offices were closed on October 12, 1981; however, the Rule 13e–1 statement was filed in the Washington, D.C. office of the S.E.C. at 8:50 a. m. on October 13, 1981 and, at 2:30 p. m. on October 13, 1981, in the New York S.E.C. office.

The opening of trading in Grumman stock was delayed on Monday, October 12, 1981. Dillon, Read & Company was authorized to purchase 1,275,000 shares on that day for the Pension Fund. The Pension Fund purchased 958,000 shares through Dillon, Read from arbitrageurs, institutions and other investors. All transactions were made on the New York Stock Exchange prior to 3:30 p. m. Some purchases consisted of large blocks—a block of 100,000 and a block of 142,000 shares. The price ranged from a low of $36 to a high of $39 ⅝ at an average price of about $38.

On Tuesday morning the Wall Street Journal featured an article under the headline:

"Grumman Pension Plan Buys More Stock in Effort to Block LTV, Which Plans Suit"

It quoted Bierwirth as saying, "It looks as if a majority (of Grumman stock) won't be tendered to LTV." The article further revealed that the Investment Plan held 3.2 million shares (23%) and the total held by the Pension Plan and Investment Plan was 35%.

Dillon, Read purchased 200,000 additional shares of stock for Grumman on Tuesday, October 13, 1981. The purchases were made at the market price on the New York Stock Exchange.

Grumman issued a press release on Tuesday, October 13, 1981 announcing that the Pension Plan and the Investment Plan had acquired 1,160,000 shares for a total of 5,200,000 shares or 37% of the company's stock on a fully diluted basis.

On October 14, 1981 as of 2:00 p. m. the Pension Plan and/or the Investment Plan purchased about 75,000 shares of Grumman stock.

### Discussion

#### Standing

Defendants challenge plaintiffs' right to prosecute claims for violations of §§ 13(d), 14(d) and 14(e) of the 1934 Act.[5] A serious question is presented as to whether a private right of action in favor of a tender

---

4. Plaintiffs lack standing to prosecute an action based on a violation of the trustees' fiduciary duties under ERISA, 29 U.S.C. § 1132. The court therefore will not discuss the claim in Count III as a basis for injunctive relief.

5. Defendants cite *Piper v. Chris-Craft Industries, Inc.*, 430 U.S. 1, 97 S.Ct. 926, 51 L.Ed.2d 124 (1977) (Tender offeror does not have a private right of action for damages under § 14(e); *Touche Ross & Co. v. Redington*, 422 U.S. 560, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979) (In context of claim by Securities Investor Protection Corporation of a violation of § 17(a) of the 1934 Act, Court stated that it will adhere "to a stricter standard for the implication of private

offeror may be implied under either 13(d), 14(d) or 14(e).[6]  We assume standing for the purpose of this motion.

*The Merits*

■ The activities of Grumman, the Pension Fund and Investment Fund in purchasing Grumman stock is designed to defeat the tender offer.  Plaintiffs have therefore shown irreparable harm.  However, the claims in Counts I and II are without merit.  Neither claim is likely to succeed on the merits;  neither claim presents "serious questions going to the merits to make them a fair ground for litigation ..." *Jackson Dairy, Inc. v. H.P.Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir. 1979).

■ The Transaction Statement filed pursuant to Rule 13e–1 was sufficient in form and timely filed.  The only remaining issue is whether, as plaintiff contends, the massive buying program, with its attendant press releases and public statements made with a view to defeat LTV's tender offer, constituted a tender offer.  The court finds that it did not.  The other claims made by plaintiffs based on the assumption that defendants' buying program was a tender offer fail and need not be discussed.

The proof that all the transactions for the purchase of stock on October 12, 13 and 14 took place during the business day (before 3:30 p. m.) on the New York Stock Exchange at the then current market prices is beyond dispute.[7]

In *Kennecott Copper Corp. v. Curtiss-Wright Corp.*, 584 F.2d 1195 (2d Cir. 1978), Curtiss-Wright purchased all of its stock in Kennecott on national exchanges.  One of

Curtiss-Wright's brokers had solicited fifty Kennecott shareholders off the floor of the exchange, but the sales were made on the floor of the exchange.  Another broker had solicited approximately a dozen institutional holders of Kennecott and consummated an unspecified number of sales off the floor of the exchange.  Those sales were from well-informed, sophisticated institutions.  In rejecting Kennecott's argument that Curtiss-Wright's method of acquiring the stock constituted a tender offer which was subject to the provisions of Section 14 of the Act, the court said:

> Subsection (d)(5) provides that securities deposited pursuant to a tender offer may be withdrawn within seven days of the publication or delivery to shareholders of the tender offer or at any time after sixty days from the date of the original tender offer.  Subsection (d)(6) requires offerors to purchase securities on a pro rata basis where more are tendered than the offeror is bound or willing to take.  Subsection (d)(7) provides that where the offeror increases the offering price before the expiration of his tender offer, those tenderers whose stock has already been taken up are entitled to be paid the higher price.  It seems unlikely that Congress intended "tender offer" to be so broadly interpreted as to make these provisions unworkable.  *See Gulf & Western Industries, Inc. v. Great Atlantic & Pacific Tea Co.*, 356 F.Supp. 1066, 1073–74 (S.D.N.Y.), aff'd, 476 F.2d 687 (2d Cir. 1973).

> In any event, we know of no court that has adopted the extremely broad interpretation Kennecott urges upon us in this

causes of action" than it previously had under *J.I. Case Co. v. Borak*, 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964); *Gateway Industries, Inc. v. Agency Rent-A-Car, Inc.*, 495 F.Supp. 92 (N.D.Ill.1980); *Sta-Rite Industries, Inc. v. Nortek, Inc.*, 494 F.Supp. 358 (E.D.Wis. 1980) (No private right of action in favor of issuer exists under section 13(d)).

**6.** In *GAF Corporation v. Milstein*, 453 F.2d 709 (2d Cir. 1971), *cert. denied*, 406 U.S. 910, 92 S.Ct. 1610, 31 L.Ed.2d 821 (1972), the court held that an issuer had standing in action for injunctive relief based on violation of Section 13(d).  In *Weeks Dredging & Contracting v. American Dredging*, 451 F.Supp. 468 (E.D.Pa. 1978), it was held that a tender offeror has

standing to bring an action for injunctive relief against the target company for violation of Section 14(e).  And in *Humana, Inc. v. American Medicorp, Inc.*, 445 F.Supp. 613 (S.D.N.Y. 1977) the tender offeror was held to have standing to seek an injunction against a competing offeror for violation of Section 14(e).

**7.** Plaintiffs' suggestion that Grumman's purchase of the shares at a higher price than the previous closing price, an increase resulting from the intense demand by Grumman, represented a premium over market, overlooks the basic principle that price is determined by supply and demand.

case. Kennecott's contention, as we understand it, is that whenever a purchaser of stock intends through its purchasers to obtain and exercise control of a company, it should immediately file a Schedule 13D. Kennecott conceded in the trial court that no pressure was exerted on sellers other than the normal pressure of the marketplace and argued there and here that the absence of pressure is not a relevant factor. Kennecott also conceded in the trial court that no cases supported its argument and that it was asking the court to "make new ground." The district court did not err in refusing to do so. *See Copperweld Corp. v. Imetal*, 403 F.Supp. 579, 597–98 (W.D.Pa.1975). 584 F.2d at 1207.

The motion is denied, and it is

SO ORDERED.

This memorandum of decision contains findings of fact and conclusions of law required under Rule 52(a) of the Federal Rules of Civil Procedure.