Peter L. HOLSTEIN, et al., Plaintiffs,

v.

UAL CORPORATION, Defendant and Nominal Defendant,

and

Walter A. Haas, Jr., Andrew F. Brimmer, et al., Defendants.

No. 87 C 3888.

United States District Court, N.D. Illinois, E.D.

June 9, 1987.

Robert A. Holstein, Richard S. Schiffrin, Holstein, Mack & Dupree, Frederic F. Brace, Jr., Michael D. Craig, Law Offices of Frederic F. Brace, Jr., Chicago, Ill., for plaintiffs.

Edward L. Foote, Duane M. Kelley, Winston & Strawn, Chicago, Ill., Stephen P. Sawyer, J. Craig Busey, United Air Lines, Elk Grove Village, Ill., for defendant UAL Corp.

John Powers Crowley, Matthew F. Kenelly, Cotsirilos & Crowley, Ltd., Chicago, Ill., for remaining defendants.

### MEMORANDUM AND ORDER

MORAN, District Judge.

Plaintiff Peter Holstein filed this action against UAL Corporation ("UAL") and the individual members of UAL's board of directors after UAL adopted a Preferred Share Purchase Rights Plan (the "Rights Plan"). The complaint consists of four counts. In count I Holstein alleges that UAL's adoption of the Rights Plan violated federal securities laws relating to tender offers. Counts II, III and IV are pendent state claims in which Holstein alleges that UAL's directors breached their fiduciary duties by adopting the Rights Plan and by

engaging in other tactics allegedly designed to deter unwanted takeover bids. Holstein is a shareholder of UAL. He seeks to maintain this action both as a derivative suit on behalf of UAL and as a class action on behalf of other similarly situated UAL shareholders.

Subject matter jurisdiction over this case rests entirely on the federal securities claim alleged in count I. Counts II, III and IV are pendent state claims and there is no diversity of citizenship. Defendants move to dismiss the complaint for lack of subject matter jurisdiction, contending that count I fails to state a federal claim and that it does not present an actual controversy. The motion is granted.

## UAL'S RIGHTS PLAN

UAL's Rights Plan is a version of the so-called "poison pill," an increasingly common measure taken by corporate management in response to actual or potential takeover activity. *See, e.g., Dynamics Corp. v. CTS Corp.*, 637 F.Supp. 406 (N.D. Ill.1986), *aff'd*, 794 F.2d 250 (7th Cir.1986), *rev'd on other grounds*, —— U.S. ——, 107 S.Ct. 1637, 95 L.Ed.2d 67 (1987); *Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.*, 506 A.2d 173 (Del.1986); *Moran v. Household International, Inc.*, 500 A.2d 1346 (Del.1985). *See generally* Helman & Junewicz, *A Fresh Look at Poison Pills*, 42 Bus.Law. 771 (1987). UAL's board of directors implemented the Rights Plan when it declared a dividend distribution of Preferred Share Purchase Rights (the "Rights") on December 11, 1986. The Rights were distributed on December 31, 1986 to shareholders of record as of December 22, 1986. The Rights have no voting power and they will expire after ten years.

At present the Rights are not exercisable, they are not represented by certificates and they trade automatically with UAL's common shares. The Rights will change character rather significantly, however, if certain "triggering events" take place. A triggering event will occur if a person or group either acquires 20% or more of UAL's shares or announces an offer to acquire 30% or more of the shares (even if no purchases actually occur). Upon such an event the acquiring person's Rights will become void. Ten days after the triggering event separate certificates representing the rights will be distributed to the remaining Rights holders. The Rights then may be traded independently from UAL shares.

The Rights also will become exercisable ten days after a triggering event. A holder may exercise one Right to buy $1/100$th of a share of UAL's Series C Junior Participating Preferred Stock for $185. If UAL later is involved in a merger or similar transaction, each Right will entitle holders to buy a number of shares of the surviving company having a market value equal to twice the exercise price of the Right. However until the Rights become exercisable, UAL may redeem them for $.05 each or it may act to extend the redemption period.

## DISCUSSION

Section 13 of the Securities Exchange Act of 1934, 15 U.S.C. § 78m(e), governs an issuer's repurchase of its own securities. It was enacted in 1968 as part of the Williams Act, Pub.L. No. 90–439, 82 Stat. 454 (1968). Rule 13e–4, 17 C.F.R. § 240.-13e–4, applies to such a repurchase if it constitutes a tender offer by the issuer. In count I Holstein alleges that the Rights Plan is such an issuer self-tender and that the defendants violated Section 13(e) and Rule 13e–4 when they implemented it. Specifically, Holstein alleges that the defendants ignored the filing requirements of Rule 13e–4(c), (d), (e) and (f). In addition, Holstein alleges that the Rights Plan violates the recently adopted "all-holders rule," Rule 13e–4(f)(8), because it discriminates against an acquiring person. Securities Exchange Act Release No. 34–23421, [1986–87 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 84,016 (July 11, 1986). Failure to comply with these provisions automatically results in a violation of Rule 13e–4(b)(2)(i) and of Section 13(e).[1]

---

**1.** In his memorandum Holstein argues that a letter from the UAL board to UAL shareholders

concerning the Rights Plan contained materially misleading misrepresentations and omissions in

Defendants contend that the Rights Plan is not a tender offer, so the regulations they allegedly violated do not apply. The court agrees. A conventional tender offer normally consists of a bid by an individual or group to buy shares of a company—usually at a price above the current market price. Those accepting the offer are said to tender their stock for purchase. The person making the offer obligates himself to purchase all or a specified portion of the tendered shares if certain specified conditions are met. H.R.Rep. No. 1711, 90th Cong., 2d Sess. 1, *reprinted in* 1968 U.S.Code Cong. & Ad. News 2811; *see SEC v. Texas International Co.,* 498 F.Supp. 1231, 1239 (N.D.Ill. 1980); *see also* 17 C.F.R. § 240.13e–4(a)(2) (defining "issuer tender offer"). Defendants' position, in a nutshell, is that the Rights Plan cannot be an issuer self-tender because UAL has not offered to purchase any of its outstanding shares.

■ Holstein agrees that the Rights Plan does not constitute a conventional tender offer, but he correctly contends that the requirements imposed by Section 13(e) and Rule 13e–4 are not limited to conventional tender offers. Neither the Congress nor the SEC has ever defined the term "tender offer," in part because of the "almost infinite variety in the terms of most tender offers." *See, e.g., Hanson Trust PLC v. SCM Corp.,* 774 F.2d 47, 56 (2d Cir.1985), *quoting Full Disclosure of Corporate Equity Ownership in Corporate Takeover Bids: Hearings on S. 510 Before the Subcommittee on Securities of the Senate Committee on Banking and Currency,* 90th Cong., 1st Sess. 18 (1967) (statement of Manuel Cohen, Chairman, SEC); Securities Exchange Release No. 12676, [1976–77 Transfer Binder] Fed.Sec. L.Rep. (CCH) ¶ 80,659 at 86,695–96 (August 2, 1976). The SEC later proposed a definition but it was never adopted. Securities Exchange Act Release No. 16385, [1979–80 Transfer Binder] Fed.Sec.L.Rep. (CCH) 82,-374 at 82,601–06 (Nov. 29, 1979); *see e.g.,* Mather, *The Elusive Definition of Tender Offer,* 7 J. Corp. L. 503 (1982); *Note, Toward a Definition of "Tender Offer",* 19 Harv. J. on Legis. 191 (1982).

Courts also have recognized the need to retain flexibility in defining "tender offer." *See also, e.g., Tcherepnin v. Knight,* 389 U.S. 332, 336, 88 S.Ct. 548, 553, 19 L.Ed.2d 564 (1967) (noting that securities laws should be construed broadly to further their remedial purposes and holding that a withdrawable share in a savings and loan association is a "security" under § 3(a)(10) of the Securities Exchange Act). Rather than attempting to formulate a precise definition, courts have looked to a variety of factors to determine whether a tender offer exists in light of the congressional policies underlying the Williams Act. *See, e.g., SEC v. Carter Hawley Hale Stores, Inc.,* 760 F.2d 945, 949–53 (9th Cir.1985); *Wellman v. Dickson,* 475 F.Supp. 783, 823–24 (S.D.N.Y.1979) (both applying an eight-factor test advanced by the SEC); *Hanson Trust,* 774 F.2d at 57 (tender offer determination depends on whether "in light of the totality of circumstances, there appears to be a likelihood that unless the pre-acquisition filing strictures ... are followed there will be a substantial risk that solicitees will lack information needed to make a carefully considered appraisal of the proposal put before them"); *see also Texas Int'l,* 498 F.Supp. at 1239–45; *S–G Securities, Inc. v. Fuqua Invest. Co.,* 466 F.Supp. 1114, 1126–27 (D.Mass.1978). Holstein argues that the Rights Plan is subject to federal tender regulations under these flexible standards.

That argument is not as farfetched as defendants seem to think. The SEC has taken the position that certain kinds of Rights Plans can be subject to tender offer regulations under certain circumstances. In a no-action letter, the staff of the SEC's Division of Corporation Finance observed that

[t]he Commission recently has expressed the view that a "back-end" Rights Plan does constitute a tender offer, the commencement of which will occur on the date the rights first become exercisable.

violation of Rule 13e–4(b)(1). Those allegations do not appear in the complaint. Even if they did, however, they would not change the outcome.

Accordingly, the exchange offer conducted pursuant to such a Rights Plan had to be made in compliance with the requirements of §§ 13(e), 14(d) and 14(e) of the 1934 Act and the rules promulgated thereunder. Since Rule 13e–4(f)(8)(i) requires a tender offer to be made to all holders of the securities subject to the offer, any Rights Plan that excludes certain shareholders from participation in an exchange offer subject to the rule would be prohibited.

*Registration of Rights Issuable Pursuant to Stockholder Rights Plans* (January 7, 1987) (available on Lexis, Fedsec library, Noact file) [Available on WESTLAW, FSEC–NAL database] (footnote omitted); *see Registration of Rights Not Required, Staff Indicates in Interpretive Letter,* 19 Sec.Reg. & L.Rep. (BNA) 183 (1987). As used in the letter, "back-end" plan means a plan under which shareholders are entitled to exchange a right and a share of common stock for cash or securities of the issuer.

The court assumes without deciding that the rule announced in a no-action letter is correct, and that it applies to the Rights Plan here.[2] Under the rule, however, a rights plan will not amount to a tender offer unless and until the rights become exercisable. Similarly, courts formulating and applying flexible standards in determining whether federal tender offer regulations apply almost invariably presuppose the existence of some kind of offer to purchase or exchange securities. These courts recognized that the congressional policy underlying the Williams Act was to control the pressure on shareholders to make hasty uninformed decisions and that that policy determined whether the offer was a tender offer or merely a private transaction.[3]

But the policy underlying the Williams Act is not now implicated by the Rights Plan here. UAL is not offering to purchase anything, and until the Rights become exercisable UAL shareholders simply have no decisions to make under the Rights Plan. After the Rights become exercisable, it might be possible to characterize the Rights Plan as an "offer" of some kind. If it is so characterized, it might amount to a tender offer, albeit an unconventional one, because Rights holders would have to decide whether or not to exchange the Rights plus the exercise price for other securities. However, the court need not resolve that issue because Rights holders are not now confronted with such a decision. At least for the present, therefore, the Rights Plan cannot amount to a tender offer within the meaning of the Williams Act. *See Panter v. Marshall Field & Co.,* 646 F.2d 271, 285 (7th Cir. 1985) (Williams Act general anti-fraud provision inapplicable where proposed tender offer never became effective, because the language "seem[s] to contemplate the existence of an effective offer capable of acceptance" and "the legislative history is replete with indications that Congress intended to protect an investor faced with the pressures generated by the exigencies of the tender offer context"), *cert. denied,* 454 U.S. 1092, 102 S.Ct. 658, 70 L.Ed.2d 631 (1981). Consequently, defendants have not violated the filing requirements imposed by the Williams Act.

Holstein contends that the Rights Plan is actionable under the Williams Act even if no tender offer currently exists. He relies on *Applied Digital Data Systems, Inc. v. Milgo Electronic Corp.,* 425 F.Supp. 1145 (S.D.N.Y.1977), and its progeny, which hold

---

**2.** The parties have not filed a copy of the actual Rights agreement here, but on this motion the court must make all reasonable inferences in Holstein's favor.

**3.** *See also Kennecott Copper Corp. v. Curtiss-Wright Corp.,* 584 F.2d 1195, 1207 (2d Cir.1978); *Energy Ventures, Inc. v. Appalachian Co.,* 587 F.Supp. 734, 739 (D.Del.1984); *Ludlow Corp. v. Tyco Laboratories, Inc.,* 529 F.Supp. 62, 68 (D.Mass.1981); *LTV Corp. v. Grumman Corp.,* 526 F.Supp. 106, 109 (E.D.N.Y.1981); *Brascan*

*Ltd. v. Edper Equities, Ltd.,* 477 F.Supp. 773, 789–92 (S.D.N.Y.1979). The Supreme Court also has analyzed the legislative policy underlying the Williams Act. *See Schreiber v. Burlington Northern, Inc.,* 472 U.S. 1, 8, 105 S.Ct. 2458, 2463, 86 L.Ed.2d 1 (1985), *quoting Rondeau v. Mosinee Paper Corp.,* 422 U.S. 49, 58, 95 S.Ct. 2069, 2075–76, 45 L.Ed.2d 12 (1975); *Piper v. Chris Craft Indus., Inc.,* 430 U.S. 1, 35, 97 S.Ct. 926, 946, 51 L.Ed.2d 124 (1977).

that the Williams Act general anti-fraud provision may apply to statements made before a tender offer is actually made, reasoning that

[a]lthough the shareholders might not in the pre-offer period be faced with a present decision whether to exchange their stock in the target corporation, statements and actions of the target corporation and the offeror during this period clearly have the capacity to affect any future decision and should thus fall within the purview of the statute. This is especially so when, as here, the competing parties by their acts and conduct clearly indicate that in fact they deem the proposal of an exchange offer to be genuine.

425 F.Supp. at 1154. Thus courts have held that misrepresentations made after a proposed tender offer is publicly announced are actionable where it is likely that the proposed tender offer will become effective. *See Sanders v. Thrall Car Mfg. Co.*, 582 F.Supp. 945, 967 (S.D.N.Y.1983), *aff'd*, 730 F.2d 910 (2d Cir.1984); *Lewis v. McGraw*, 495 F.Supp. 27, 30 (S.D.N.Y. 1979), *aff'd*, 619 F.2d 192 (2d Cir.), *cert. denied*, 449 U.S. 951, 101 S.Ct. 354, 66 L.Ed.2d 214 (1980); *Panter v. Marshall Field & Co.*, 486 F.Supp. 1168, 1188–91 (N.D.Ill.1980), *aff'd*, 646 F.2d 271 (7th Cir.), *cert. denied*, 454 U.S. 1092, 102 S.Ct. 658, 70 L.Ed.2d 631 (1981); *see also Hanna Mining Co. v. Norcen Energy Resources Ltd.*, 574 F.Supp. 1172, 1198–1200 (N.D.Ill. 1982) (pre-announcement misrepresentations actionable where tender offer was contemplated long before it was actually announced and reliance on the statements in issue was probable under the circumstances).

■ But count I fails to state a claim even if the Rights Plan is in some sense a proposed tender offer. Unlike a proposed conventional tender offer, a Rights Plan is normally adopted in the hopes that it will never become operational. UAL's Rights Plan is no exception—it is designed to deter attempts to acquire UAL in a manner or on terms not approved by its current board of directors. If it works, no unfriendly acquisition attempts will be made, no triggering event will occur and the Rights will never become exercisable. On the other hand, if the board approves a proposed merger or similar transaction with a friendly acquiror, presumably the board also would redeem the Rights before they became exercisable. There is nothing to support the inference that the defendants adopted the Rights Plan with the intention that the Rights would become exercisable. Moreover, despite the ongoing controversy concerning the future of UAL (which recently changed its name to Allegis), Holstein does not allege that a triggering event has occurred, nor is there anything to suggest that one is imminent. Thus the Rights Plan is not actionable as a proposed tender offer because it is unlikely that the Rights will ever become exercisable. *Cf. Panter*, 486 F.Supp. at 1190–91 (alleged misrepresentations made in connection with a proposal subject to some twenty conditions not actionable under the Williams Act).[4]

Similarly, the court does not believe that count I presents an "actual controversy" for the purposes of the Declaratory Judgment Act, 28 U.S.C. § 2201(a), or Article III of the United States Constitution. An "actual controversy" exists only if Holstein and those whom he purports to represent have sustained or are in immediate danger of sustaining a direct injury as a result of a Williams Act violation. *See, e.g., Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 240–41, 57 S.Ct. 461, 463–64, 81 L.Ed. 617 (1937); *Foster v. Center Township*, 798 F.2d 237, 242 (7th Cir.1986); *National Union Fire Ins. Co. v. Continental Illinois Corp.*, 646 F.Supp. 746 (N.D.Ill.1986). Holstein does not allege that a triggering event has occurred or that one is imminent. Without those allegations any possible violation of the Williams Act, and any injury

---

4. For similar reasons, Holstein would not be entitled to injunctive relief either. *See, e.g., Lewis v. McGraw*, 619 F.2d at 195 ("Injunctive relief, moreover, may be available to restrain or correct misleading statements made during the period preceding a tender offer where it appears that such an offer is likely, and that reliance upon the statements at issue is probable under the circumstances.").

resulting from such a violation, is purely hypothetical.

Perhaps the UAL board acted improperly. Plaintiffs certainly so contend in their pendent claims, and they apparently have raised similar claims in a state action. State law provides redress for corporate impropriety, which can include the adoption of an impermissible "poison pill," with or without a tender offer. The Williams Act does not, however, provide a federal mechanism for an early review of a Rights Plan such as this. Accordingly, this court does not have subject matter jurisdiction over count I.

## CONCLUSION

Defendants' motion to dismiss is granted.